# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57495-1-II |
| Respondent, | |
| v. | |
| MARK STEVEN CHESLER JR., | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Mark S. Chesler Jr. appeals his conviction for residential burglary after a bench trial. Chesler argues that the State presented insufficient evidence from which a rational trier of fact could have concluded that he unlawfully entered the back door of his ex-wife's apartment. As part of his sufficiency of the evidence challenge, Chesler assigns error to several findings of fact and conclusions of law.

We disagree and affirm.

## FACTS

### I. BACKGROUND

On April 12, 2022, C.M. called 911 from her apartment. The call was an open-line communication, and a male could be heard yelling in the background. After several minutes, C.M. began speaking to the 911 operator. The 911 operator contacted law enforcement, informing them that the dispute sounded violent in nature and could be physical.

Police Officer Michael Barela responded to the residence and spoke to C.M. C.M. told the officer that Chesler, her ex-husband, was involved and had just left the apartment.[1] C.M. and Chesler did not live together. C.M. showed the officer a broken chair on the floor, a broken back door, and a wet mud print on the back door. Officer Barela observed that the door trim and the faceplate (which held the lock bolt when the door was in a closed position) were on the floor. From these observations, the officer concluded that the door had been kicked open. C.M. told the officer that the chair was not broken prior to Chesler's arrival.

C.M. explained that she and Chesler were in a dispute over a bill of sale for a car that Chesler possessed but did not own. Chesler showed up to get C.M. to sign a bill of sale so that he could prove his legal ownership of the car. C.M. said Chesler threw her car keys over a fence during the dispute.

Later that day, law enforcement arrested Chesler at his residence. The State ultimately charged him with residential burglary and third degree malicious mischief, each with special allegations of domestic violence.

II. EVIDENCE AT TRIAL

The case proceeded to a bench trial. The State called Officer Barela who testified consistently with the above facts. The officer also testified that C.M.'s demeanor was similar to other domestic violence victims that he had interviewed in the past because she was frantic and afraid. He continued,

> [A]s we were talking, she was really hesitant to speak with me at first. She -- from my conversation with her, I felt she was contemplating the consequences of telling me information, and she also was looking over her shoulder at the door. She -- it seemed as if the threat was still present in her mind.

---

[1] C.M. and Chesler married in 2016 and divorced a year later.

. . . .

[Her body language] was very closed off. Her arms were folded. She seemed like she was taking defensive postures, which I've seen numerous times in victims of domestic violence.

Verbatim Rep. of Proc. (VRP) at 25-26.

Because C.M. said she was afraid of Chesler, the officer gave her suggestions on how to resecure the door to prevent forced entry and suggested that she go to a relative's house. C.M. asked the officer to inform her when Chesler had been taken into custody so that she could feel safe.

Officer Barela also testified that when Chesler was in custody, he admitted that things had "gotten out of hand." VRP at 28.

The State then called C.M. as a witness. She said that Chesler frequently came to her residence and that the two had an "on again/off again" relationship. VRP at 42. At the time of the incident, the two may have been "off again." VRP at 42. C.M. testified that Chesler had a key to her apartment, they saw each other several times a week, and Chesler did not need to knock when he visited her. In response to a question about whether Chesler had permission to enter her residence, C.M. answered, "He didn't not have my permission." VRP at 35.

She conceded it was possible that she told Chesler to come over to her residence on the day of the dispute to sign a bill of sale. When C.M. was asked whether Chesler called her first to get her permission to come over to her apartment, the following exchange took place:

[Prosecutor]: And before he came over that day, he didn't call first and get your permission, did he?

[C.M.]: We had been arguing back and forth.

3

[Prosecutor]: So[,] is that no?

[C.M.]: Maybe.

VRP at 49.

She also explained that the back door had been broken for several months at the time of the incident. But she acknowledged that the faceplate broke off and fell on the floor when Chesler entered the house. And she testified that Chesler took the keys to her car and threw them into a field.

C.M. admitted that when Officer Barela asked her if she wanted a protection order, she said yes. But she also claimed that she had exaggerated things to the investigating officer and let her emotions get the better of her. C.M. said that she did not want Chesler to get in trouble but also said she did not want to see him get in trouble for something that he did not do.

Chesler testified in his own defense. He stated that he had a key to C.M.'s apartment that worked for the front door but not the back door because the back door would not lock properly and was broken. He denied that the muddy foot print on the door was from the day of the dispute but claimed it was, instead, from a few days earlier when one of them used their foot to open the back door to bring in groceries. Chesler said he went over to C.M.'s residence because C.M. invited him over to her apartment to pick up a bill of sale and she did not have it ready for him when he arrived.

Chesler admitted that this made him angry and that he called C.M. a "f[*]cking idiot." VRP at 58. He denied throwing her keys during the incident and suggested he threw them on a different day.

Photographs of the faceplate, door trim, back door, mud print, and broken chair were admitted into evidence along with the 911 tape.

III. VERDICT AND SENTENCING

The trial court found Chesler guilty of all charged counts.

The trial court gave an oral ruling. As to the residential burglary count (which requires both an intent to commit a crime and an unlawful entry), the trial court stated there was no question Chesler had an intent to commit a crime against a person or property therein because Chesler admitted to breaking the chair upon entry and depriving C.M. of her keys.

But the trial court said it was somewhat struggling with the element of unlawful entry. Nonetheless, the trial court stated that it was making a reasonable inference that Chesler was not invited in the house in the manner that he entered. The trial court explained,

> It's not reasonable to assume that somebody allows you to kick their back door in. I don't think there's any question that the back door was kicked in. I know that [C.M.] stated the door had previously been damaged. That doesn't change the fact that it was kicked in on the day in question.
>
> . . . .
>
> She pointed out to the officer that the door was broken, that the doorjamb was broken, that the faceplate was broken and on the floor. The position of the faceplate on the floor clearly indicated that it had to basically fly off rather than just drop. . . .
>
> And at the time of the incident, [C.M.] had pointed out the damage to the door, which indicates that it wasn't previously that way before the officer got there. She pointed out the broken chair, which Mr. Chesler admitted to breaking.

VRP at 75-76.

In arriving at its decision, the trial court explicitly said it did not find Chesler credible and did not find C.M. "all that credible." VRP at 75. However, the trial court explained that it found the officer to be credible and heavily relied on his testimony.

5

Pointing to the officer's testimony about how C.M.'s demeanor was consistent with other domestic violence victims, the trial court found that C.M. was not expecting Chesler and did not invite him to enter the way he did, by kicking in the door.

Moreover, the trial court explained that Chesler entered through the back door even though he had a key and C.M. called 911 upon his arrival, further suggesting that C.M. did not expect him. The trial court stated,

> And the reasons I look at it that way is, one, he had a key to the front door. Instead of using the key to the front door, he kicked in the back door. It's evident that he kicked it in based on the damage, based on [C.M.] indicating to the officer that it wasn't there prior to . . . that incident.
>
> There was a wet footprint on the back of the door. The officer examined that. It was wet. It was fresh, so that does not correlate with Mr. Chesler's testimony that the footprint was made a few days prior. It was clear [C.M.] did not expect him, because she called 911. If you are expected in someone's home, you don't call -- the homeowner does not call 911.

VRP at 76-77.

Regardless of whether C.M. had previously given Chesler permission to enter the house, the trial court ultimately decided that Chesler did not have permission on the day of the dispute:

> Whether or not Mr. Chesler was previously given rights to enter the house, *he clearly was not on the day in question* or in the manner in question based on her feeling fearful enough [to] call 911. She also stated to the officer that she wanted a protection order. That again indicates to the [c]ourt that she was afraid, intimidated, and obviously did not invite Mr. Chesler into the home in that manner.

VRP at 77 (emphasis added).

6

At the sentencing hearing, the trial court noted that Chesler had "one of the most atrocious criminal histories involving domestic violence [it had] ever seen."[2]  VRP at 95.  The trial court sentenced Chesler to 84 months of total confinement, a term within the standard sentencing range.

IV.  TRIAL COURT'S WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW

Several months after issuing its oral ruling and sentencing the defendant, the trial court entered written findings of fact and conclusions of law.  The trial court's written findings of fact stated in relevant part:

> 1.1.  On 4-12-2022, the defendant, Mark Steven Chesler, Jr., intentionally kicked in the door to the apartment occupied by [C.M.].  The apartment was located in Lewis County, Washington.  He then entered the apartment.
>
> 1.2.  By kicking in the door, the defendant broke the lock faceplate off the door jam, and broke off the door trim holding the lock faceplate in place.
>
> 1.3.  After the incident, when Officer [Barela] (Centralia PD) arrived, [C.M.] showed him the faceplate and door trim on the floor, in front of the door.
>
> 1.4.  Officer [Barela] noticed a shoe print on the door where Chesler had kicked it.
>
> 1.5.  The position of the faceplate and door trim were such that it was obvious the two items flew into the room from the force of the kick rather than just dropped out of the door when it was opened.
>
> 1.6.  Chesler and [C.M.] were former intimate partners.
>
> 1.7.  Prior to 04-12-2022, Chesler and [C.M.] had a relationship whereby Chesler was free to come and go from [C.M.'s] apartment.  However, the [c]ourt finds that Chesler was never invited into [C.M.'s] apartment in the violent manner in which he entered on this occasion.
>
> 1.8.  [C.M.] was not expecting Chesler to visit on 4-12-2022, and he was not invited into [C.M.'s] home on that date.
>
> 1.9.  When Chesler entered [C.M.'s] apartment, he not only broke the door trim, he knowingly broke a chair that was in the way of the door upon his entry.  The value of the chair was less than $750.

Clerk's Papers (CP) at 33-34.

---

[2] Chesler's judgment and sentence showed that he had six prior domestic violence related convictions and a second degree theft conviction.

No. 57495-1-II

As part of its conclusions of law, the trial court found Chesler's entry of C.M.'s apartment

to be unlawful and found Chesler guilty of residential burglary and third degree malicious

mischief. The conclusions of law related to the residential burglary count stated:

> 2.2. The [c]ourt finds the defendant's entry of [C.M.'s] apartment on 4-12-202[2] to be unlawful.
>
> 2.3. The [c]ourt finds the defendant guilty of *Residential Burglary*, as charged in Count 1 of the original information.

CP at 35.

Chesler appeals.[3]

ANALYSIS

Chesler argues that insufficient evidence supports his conviction for residential burglary.

As part of his sufficiency of the evidence challenge, Chesler argues that the trial court erred in

making related findings of fact and conclusions of law.

I. LEGAL PRINCIPLES

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d

897, 903, 365 P.3d 746 (2016). We view the evidence in the light most favorable to the State and

"determine whether any rational fact finder could have found the elements of the crime beyond a

reasonable doubt." *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). "Specifically,

following a bench trial, appellate review is limited to determining whether substantial evidence

supports the findings of fact and, if so, whether the findings support the conclusions of law." *Id.*

at 105-06. " 'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the

---

[3] Chesler solely appeals his conviction for residential burglary, he does not appeal his third degree malicious mischief conviction.

8

truth of the asserted premise." *Id.* at 106 (quoting *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). Unchallenged findings of fact are verities on appeal. *See id*.

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). And we defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

"A person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, the person enters or remains unlawfully in a dwelling other than a vehicle." RCW 9A.52.025(1). "A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2).

II. APPLICATION

Chesler's challenge focuses on the unlawful entry element of residential burglary. He essentially argues that the evidence of unlawful entry is insufficient because he had permission to enter C.M.'s residence. And if he had permission, then his entry could not have been unlawful.

Chesler acknowledges that it is unreasonable to assume a person can lawfully kick in somebody's door, but asserts that this type of behavior constitutes third degree malicious mischief, not residential burglary. By ruling otherwise, the trial court "confuse[d]" permission to enter with

9

*method* of entry.  Amended Br. of Appellant at 16.  Chesler supports this argument by specifically

challenging the trial court's findings of fact 1.7 and 1.8, and conclusions of law 2.2 and 2.3.[4]

A.  FINDINGS OF FACT 1.7 AND 1.8

Chesler's argument principally relies on his challenge to findings of fact 1.7 and 1.8.

Finding of fact 1.7 states:

> Prior to 4-12-2022, Chesler and [C.M.] had a relationship whereby Chesler was free to come and go from [C.M.'s] apartment.  However, the [c]ourt finds that Chesler was never invited into [C.M.'s] apartment in the violent manner in which he entered on this occasion.

CP at 34.  And finding of fact 1.8 states:

> [C.M.] was not expecting Chesler to visit on 4-12-2022, and he was not invited into [C.M.'s] home on that date.

CP at 34.[5]  Read together, these two findings make clear that the trial court found Chesler did not

have permission to enter C.M.'s residence on April 12, 2022.[6]

---

[4] Chesler also assigns error to findings of fact 1.2 and 1.9, which pertain to the door trim and lock faceplate being broken when he kicked in the door.  Chesler suggests that, depending on how these findings are interpreted, they could be inconsistent with the testimony at trial that the door trim and lock faceplate were previously broken and were only "displaced" when the door was kicked in.  Amended Br. of Appellant at 19.

However, even if these two findings are somewhat ambiguous about whether the faceplate and door trim were previously broken or merely displaced when the door was kicked in, neither party argues that this potential ambiguity is relevant to Chesler's fundamental sufficiency of the evidence challenge; that is, whether the trial court confused permission to enter with the manner of entry.  Thus, we will not further address these findings.

[5] Because Chesler only assigns error to four findings of fact, the remaining findings are verities. *See Homan,* 181 Wn.2d at 106.

[6] As noted above, Chesler argues that the trial court confused unlawful entry with manner of entry. It is true that the language of finding of fact 1.7 is arguably ambiguous on this point because it *could* be construed as tying unlawful entry to the manner of entry ("the [c]ourt finds that Chesler was never invited into [C.M.'s] apartment in the violent manner in which he entered on this

Chesler argues that these findings are erroneous because they are inconsistent with the testimony that he had ongoing permission to enter C.M.'s home. Chesler points to his testimony that he was specifically invited that day and C.M.'s testimony that it was possible that she had invited him over for the purpose of completing the bill of sale. And even if he did not have an express invitation to enter that day, Chesler says his testimony supports his position that C.M. had given him permission to come and go from her apartment whenever he wished.

Chesler's challenge to these findings is unpersuasive. Findings of fact 1.7 and 1.8 say that even if permission had been granted in the past, Chesler did not have permission to enter C.M.'s house on April 12, 2022. Substantial evidence supports these findings.

It is true that both Chesler and C.M. testified that Chesler had previously enjoyed ongoing permission to be at the residence. And neither said directly that Chesler did not have permission on the day of the dispute. In fact, Chesler testified that C.M. specifically invited him to the residence on that day. And when asked about Chesler's permission to enter her residence, C.M. stated, "He *didn't not* have my permission." VRP at 35 (emphasis added). She was also noncommittal when directly asked whether Chesler called first to get her permission to come over to the apartment.

But the trial court, as the trier of fact, was free to make credibility assessments of this testimony. And the trial court expressed that it did not find Chesler credible and C.M. "all that

---

occasion"). CP at 34. However, any ambiguity is resolved by the clarity of finding of fact 1.8 ("[C.M.] was not expecting Chesler to visit on 4-12-2022, and *he was not invited into [C.M.'s] home on that date*."). CP at 34 (emphasis added).

credible." VRP at 75. Instead, the trial court relied heavily on the officer's testimony, finding him credible.[7] We defer to these credibility determinations. *Ague-Masters*, 138 Wn. App. at 102.

The officer's testimony, together with the physical evidence, supports the trial court's finding that Chesler was not invited (and thus did not have permission) to enter on April 12. This evidence suggests Chesler forced his way into the residence through the back door even though he had a key to enter the front door. And critically, according to the officer, C.M. displayed a demeanor consistent with a typical domestic violence victim—she called 911 and appeared frantic and afraid. As the officer described, "[S]he also was looking over her shoulder at the door. She -- it seemed as if the threat was still present in her mind." VRP at 25. And C.M. told the officer she wanted a protection order.

Regardless of whether Chesler previously had a general permission to come and go from C.M.'s apartment, this evidence supports a reasonable inference that Chesler was not invited into C.M.'s residence on the day of the incident. *See State v. Schneider*, 36 Wn. App. 237, 241, 673 P.2d 200 (1983) (holding defendant's entry was unlawful based in part on the method of entry, breaking the door latch). *See also State v. McDaniels*, 39 Wn. App. 236, 240, 692 P.2d 894 (1984) (unlawful entry may be proved by circumstantial evidence). Construing the evidence in favor of the State, a rational trier of fact could reasonably find beyond a reasonable doubt that Chesler's entry that day was unlawful.

---

[7] C.M. testified at trial that on the day of the incident she exaggerated things to the officer and let her emotions get the better of her. And she admitted that she did not want to see Chesler get in trouble. The trial court may have concluded that C.M.'s testimony at trial was skewed to protect Chesler.

Accordingly, the trial court's findings of fact 1.7 and 1.8 are supported by substantial evidence.

B.  CONCLUSIONS OF LAW 2.2 AND 2.3

Now that we have determined that these challenged findings of fact are supported by substantial evidence, it follows that these findings support the trial court's conclusions of law that determined the elements of residential burglary were met.  Again, Chesler challenges conclusions of law 2.2 and 2.3, which read:

> 2.2.  The [c]ourt finds the defendant's entry of C.M.'s apartment on 4-12-202[2] to be unlawful.
>
> 2.3.  The [c]ourt finds the defendant guilty of *Residential Burglary*, as charged in Count 1 of the original information.

CP at 35.

Chesler's sufficiency of the evidence challenge rises or falls on the assumption that he had permission to enter C.M.'s residence (but just not in the *method* of entry he chose).  But the trial court did not make that finding—as discussed above, the court found that Chesler did not have permission to enter on April 12, 2022.  And, as shown above, the findings are supported by substantial evidence.  Without an invitation or permission, Chesler's entry into C.M.'s residence was clearly unlawful, and Chesler makes no argument otherwise.  *See* RCW 9A.52.010(2) ("A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain.").  Simply put, the trial court's findings of fact support its conclusions of law that Chesler was guilty of residential burglary.[8]

---

[8] We need not necessarily agree with the verdict to find that sufficient evidence supports Chesler's conviction.  *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980) ("This inquiry does not require the reviewing court to determine whether it believes the evidence at trial established guilt beyond a reasonable doubt.").

No. 57495-1-II

CONCLUSION

Viewing the evidence and all reasonable inferences in the light most favorable to the State, we hold that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Chesler's entry into C.M.'s residence was unlawful.  We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, CJ.

LEE, J.

14